# UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF VIRGINIA
### NEWPORT NEWS DIVISION

| | |
|---|---|
| In re: )<br>)<br>DUANE L. BURTON, )<br>)<br>  *Debtor.* ) | Case No. 04-53297-SCS |
| DUANE L. BURTON, )<br>)<br>  *Plaintiff,* )<br>)<br>v. )<br>)<br>EDUCATIONAL CREDIT )<br>MANAGEMENT CORP., )<br>CONTINENTAL SERVICE GROUP, INC., )<br>)<br>  *Defendants.* ) | APN 05-5016-SCS<br><br><br><br><br><br>Chapter 7 |

## MEMORANDUM OPINION

This matter came on for trial on November 1, 2005, upon the Complaint by Debtor to Determine Dischargeability of Educational Loans under § 523(a)(8) of the Bankruptcy Code. At the conclusion of the trial, the Court took this matter under advisement. The Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Upon consideration of the evidence and arguments presented by counsel at the trial and the pleadings submitted, the Court makes the following findings of fact and conclusions of law.

I.
## PARTIES AND PROCEDURAL HISTORY

Duane L. Burton ("Burton") filed under Chapter 7 of the Bankruptcy Code on December 15, 2004. Burton filed an adversary complaint on March 30, 2005 (the "Complaint") to determine the dischargeability of educational loans owed to Educational Credit Management Corporation and Continental Service Group, Inc. (collectively "ECMC"). Burton's Complaint alleges that he owes $96,156.29 and $16,501.58 plus interest on two separate educational loans, and that these debts should be discharged "on the grounds that excepting such debt from discharge would impose an undue hardship on the debtor and the dependents of the debtor." Pl. Compl., at 1. ECMC filed an Answer to Complaint on April 22, 2005 (the "Answer") admitting that Burton was indebted to them, but denying that the amounts alleged by Burton were the correct amounts of the claims. ECMC requests that the Court "[d]eclare the indebtedness evidenced by the Note(s) as a non-dischargeable obligation pursuant to 11 U.S.C. § 523(a)(8)." Def. Answer, at 2. Prior to trial, the parties stipulated that the Plaintiff's Chapter 7 Voluntary Petition and Schedules and the Defendant's Exhibits A-H should be admitted into evidence.[1] The parties also stipulated that Duane Burton would

---

[1] Counsel for ECMC presented eight exhibits, which are labeled A-H. Defendant's Exhibit A is an Application/Promissory Note dated December 2, 1987. Defendant's Exhibit B is a loan history and loan balance as of April 18, 2005. Defendant's Exhibit C is an assignment letter dated May 28, 2003 from New York State Higher Educational Services Corporation to ECMC. Defendant's Exhibit D is ECMC's First Set of Interrogatories ("Defendant's Interrogatories") and First Request for Production of Documents to Plaintiff. Defendant's Exhibit E is Plaintiff's Responses to Defendant's Interrogatories. Defendant's Exhibit F is Plaintiff's responses to ECMC's Request for Production of Documents. Defendant's Exhibit G is a letter to Plaintiff's counsel describing loan repayment options. Finally, Defendant's Exhibit

be the only witness called to testify.

## II.
## FINDINGS OF FACT

### A. Educational Loans

Burton, who is currently 44 years old, took out various educational loans in the 1980's to finance his college education at the University of Rochester and the State University of New York. He attended school from 1982 to 1989, and attempted to gain a Bachelor of Science degree in Sociology.[2] Burton's Schedules in his bankruptcy filing reflect that he owes more than $130,000.00 in educational loans. His Schedule F lists a debt to ECMC in the amount of $96,000.00; a debt to New York Higher Education Services in the amount of $12,087.00; and a debt to Sallie Mae Consolidation in the amount of $22,296.00, as well various Student Loan Service Center fees.[3] Burton testified that he made a couple of

---

H was reserved for any exhibits listed or identified by Plaintiff.

[2] Burton testified that while he has enough or almost enough credits to get a degree, he was unable to actually receive his degree because he left school because of his illness. Additionally, he testified that in order to get his degree, he would have to re-enroll in a college or university, but that he does not have the money to do so. Despite this testimony, Burton in his response to Defendant's Interrogatory Number 15 which asked Burton to state the "[n]ature of any degree received or will receive from such a school," stated "Bachelor of Science in Sociology." Def. Exh. E., Interrogatory No. 15.

[3] Counsel for ECMC argued that Burton actually owes over $150,000.00 in student loans, and in reaching that conclusion listed the fees owed to ECMC, New York State, and Sallie Mae, as well as approximately $44,000.00 to Rubin and Rothman. Burton's Schedule F does reflect a debt to Rubin and Rothman, LLC, in the amount of $44,217.00; however, the debt is listed as "1991 collections," and it is impossible for the Court to determine from the notation whether the amount is for educational loans. Burton testified that he owes around $100,000.00 for his student loans. Given the conflicting testimony, and how the testimony conflicts with Burton's Schedules, this Court will assume that Burton's loans total somewhere between $100,000.00 and

3

payments on his educational loans in the late 1980's and early 1990's; however, his testimony makes it clear that his payment history is very limited.[4] Further, he testified that he contacted Sallie Mae in the late 1980's or early 1990's about a loan consolidation, and that payments for his student loans have been made through tax intercepts. Burton also testified that he has a history of medical problems that have impacted his ability to stay continuously employed and therefore make his student loan payments.

## B. Educational and Employment History[5]

Burton testified that while in high school he enlisted in the Marines through a delayed entry program. Burton testified that he served in the Marines from 1977 through 1981 and during that time worked as an aircraft recovery technician. Burton further testified that he received a non-service medical discharge from the Marines after he started having stress-

---

$150,000.00.

[4] Counsel for ECMC argued that Burton has never made any attempt to pay on his student loans and in support of this argument referred the Court to the Defendant's Interrogatories. In the Interrogatories, Burton was asked "[s]tate any attempts . . . made to repay the student loans which were guaranteed by ECMC or which are presently held by ECMC," and his answer states, "[i]ncome tax intercepts (1991-present)." Def. Exh. E, Interrogatory No. 16. However, Burton testified at trial that he did make some voluntary loan payments in the late 1980's and early 1990's. Burton, while arguing he made some voluntary payments, admitted at trial that he has not made a voluntary payment since approximately 1992.

[5] Much of what the Court knows about Burton's history between 1977 and the early 1990's comes from the Court's questioning of Burton at trial. After counsel was given the opportunity to examine Burton, the Court further questioned Burton about his educational history and medical history, regarding the time period prior to Burton's relocation to Hampton Roads. Tr. at 43-52.

4

related problems that occurred after learning his oldest brother had been killed.[6] After leaving the Marines, Burton moved in with his parents, and after a few months he began working at a steel mill. Burton did not testify as to how long he worked at the steel mill, but he did testify that after working at the steel mill, he took another job working as a housekeeper.

In 1982, Burton enrolled in the University of Rochester ("Rochester"), and he testified that he stayed at Rochester for five years. Burton further testified that he left Rochester in 1987 because he was having problems coping and he had started drinking. However, Burton also testified that he was hospitalized for approximately 30 days in 1988 while at Rochester, because he had a nervous breakdown. The Court is unsure how to reconcile this testimony given the conflicting testimony regarding dates.[7]

After leaving the University of Rochester, Burton testified that he attended the University of Buffalo ("Buffalo"). While he was at Buffalo, Burton testified that he went

---

[6] Burton testified that when he learned his brother had been killed that he started questioning his life and that his mom felt his writings were "kind of strange." In fact, he testified that his mom even wrote his Congressman about him. While, Burton's testimony was not clear as to why his mother wrote the Congressman, this Court presumes it was to aid Burton in receiving a discharge from the Marines. Tr. at 46.

[7] Additionally, adding to the confusion regarding when exactly Burton was enrolled at Rochester is his answer to the Defendant's Interrogatories. When asked to list the name and dates of each school he attended in the Interrogatories, Burton listed the "University of Rochester (1982-1986)" and the "State University of New York (1987-1989)." Def. Exh. E, Interrogatory No. 15.

to a Veterans Affairs Hospital[8] that was near where he was living at the time, and it was there that he began to learn about his illness. Additionally, Burton testified that he has had problems with cocaine which began around his junior or senior year in college.[9]

Burton testified that he eventually left Buffalo and enrolled at the State University of New York at Brockport ("Brockport"), where he stayed for about a year. He further testified that he left Brockport because he "started having some issues mentally . . . [and] started drinking heavily . . . ." Tr. at 47.

After leaving Brockport, Burton testified that he "kind of floundered around" but then he started "getting [his] life together." Tr. at 49. He worked various jobs, including as a lifeguard and camp counselor, and eventually got a job at Eastman Kodak Company. Burton testified that he worked there for about two years doing factory work, and then transferred to the equipment support division because of a referral from his former wife. He worked in the equipment support division for approximately two years, but left after his divorce.[10]

---

[8] At trial, Burton referred to the hospital as the "VA Hospital." As far as this Court can ascertain, "VA" can refer to Veterans Affairs or Veterans Administration. For the purposes of this Memorandum Opinion this Court will consider the two terms as interchangeable.

[9] Given the confusion surrounding Burton's testimony regarding his dates of enrollment in school, this Court is unable to determine where Burton was in college when he first had a problem with cocaine. *See supra*, fn. 7, at 5. Further, while Burton did testify that he sought help for his drug addiction around 1989, it is not clear if he sought help immediately or if this was some time after his addiction started. It is also unclear from his testimony if he would have been a junior in college in 1989, though one can assume he must have been near his junior or senior year in 1989 since his answer to Defendant's Interrogatories states that he was enrolled in college from 1982 through 1989. Def. Exh. E, Interrogatory No. 15.

[10] Burton testified that he got married in 1995 and that the marriage only lasted one year. Relying on Burton's testimony, this means that Burton presumably left Eastman Kodak

Burton testified that he moved to Hampton Roads in 1998, and that he moved away from New York "because either I was going to kill myself or kill somebody, basically." Tr. at 51. Further, he testified that someone in the Veterans Affairs Hospital told him that there was a place in Virginia for veterans, and that it could help him start over.

Since moving to Virginia, Burton has had a sporadic employment record, with jobs at Gateway, Nextel, King's Creek Plantation and Real-Time International. Additionally, he testified that the highest paying job he ever had was with Nextel for $14.00 per hour,[11] and that job only lasted for two months. Burton stated he lost his job with Nextel, where he worked as a customer service representative, because he was having problems with his medication and had to be hospitalized.

According to Burton, he worked at Gateway for two years and that was his longest period of employment.[12] While at Gateway, Burton testified that "things started looking up," and he had a doctor who was working with him and his medications. Tr. at 11. He stated that he was starting to excel at Gateway, but then began to suffer side effects from his medications, such as paranoia and tremors. Further, he testified that he started hearing voices

---

sometime in 1996 or 1997. Burton testified he moved to Hampton Roads in 1998. He did not testify regarding the time period between leaving Eastman Kodak and moving to Virginia.

[11] Burton's answer to the Defendant's Interrogatories shows that in addition to the $14.00 per hour he made at Nextel, he made $11.00 per hour at Gateway; $7.30 per hour at Kings Creek; and $7.00 per hour at Real-Time. Def. Exh. E., Interrogatory No. 4.

[12] Presumably, when Burton testified that Gateway was his longest period of employment, he meant while living in Virginia, because he also testified that he worked for Eastman Kodak Company for a total of four years.

and had to take a lot of time off work, which eventually led to his termination at Gateway.

Burton testified that he worked at King's Creek Plantation for about a year, but that he was terminated when he started having problems with his medication. According to Burton, the problems with his medicine "would make [him] tired during times when [he] was supposed to work," and this led to him requesting time off, which ultimately led to his termination. Tr. at 10.

Burton's most recent job was in 2004 with Real-Time International, where he sold time shares. Burton's answer to the Defendant's Interrogatories reveals that he only worked twenty-five hours per week at Real-Time, thus making him a part-time employee. Def. Exh. E., Interrogatory No. 4. Further, he testified he worked for Real-Time International for about two months, but then the company closed due to financial problems.

Since working for Real-Time International in 2004, Burton testified that he has attempted to find work. According to Burton, he has attempted to gain employment through a Social Security program; by signing up with the Virginia Employment Commission; and by applying for jobs online.[13] He also testified that he has done odd jobs for a friend to make

---

[13] Burton testified that he does online job searches weekly on his computer. He testified that approximately one week before the trial, he responded to an e-mail that he received about a job but that he had not yet received a response. Counsel for ECMC asked Burton whether he had any documents, such as a e-mail or letter, showing he applied for jobs, and Burton responded that he believed those documents were submitted to the Court and counsel. However, this Court is not aware of such documentation. ECMC provided the Court with Defendant's Exhibit F, which is a Request for Admissions. Request Number 14 asked for documentation relating to any job Plaintiff has sought in the last five years. While the response states "SEE ATTACHED" below Request Number. 14, there were no documents attached for the Court to review. Def. Exh. F., Request No. 14.

money, such as digging ditches and building a fence.[14] Additionally, Burton testified that he attempted to operate his own business sometime during the latter part of 2004. He stated that he tried to start a marketing business with the help of Social Security through the Ticket to Work Program. However, he stated that the business did not succeed because he did not have money to purchase materials and that he did not think through how much it would cost to start a business.

Burton testified that he knows how to build computers and he built the computer he presently uses, but that he has been unable to get a job in that field because he lacks Microsoft certification. Burton stated that he has looked into getting computer certification through the Peninsula Work Force Development Center but that he cannot afford the cost of the certification. He testified that it costs approximately $6,000.00 to $8,000.00 to obtain certification with Microsoft and that to his knowledge there are no free programs.

### C. Medical and Family History

As previously noted, Burton's testimony reveals that his medical difficulties initially began when he was a young man in the Marines. He left the Marines in 1981 after receiving a medical discharge. However, he testified that it was not until 1987, when he was at the University of Buffalo, that he began to become aware of mental illness. Burton testified that there was a Veterans Affairs Hospital near where he lived in Buffalo, and that it was there

---

[14] Burton's testimony revealed that he only did these odd jobs so that he could buy gifts for his children and similar expenditures. Therefore, it appears he was only paid a small amount for these odd jobs, and it is unclear if these jobs had much impact on his ability to pay his student loan debts.

that he started to learn about his illness. Further, he testified that he had a nervous breakdown in 1988. Additionally, in Burton's Complaint, he alleges that he has been in and out of psychiatric hospitals since 1995. Pl. Compl., at 2.

Burton testified that he has been diagnosed with Bipolar disorder, and Burton's Complaint alleges that Hampton Veterans Affairs Hospital determined that he has Bipolar II disorder and a personality disorder. *Id.* Burton also testified that he currently receives Social Security disability because of his illness.[15] According to Burton, his illness causes him to have periods of highs followed by periods of depression, engage in risky and self-destructive behavior when he is in a manic stage, and feel depressed and worthless at times. Burton testified that he has attempted suicide approximately three times. Additionally, Burton stated that over the last fifteen years, he has been hospitalized over thirty times. Burton further testified that he has not been hospitalized recently, and that while he does not remember the exact date of his last hospitalization, it may have been around two years since he was last hospitalized.

As previously mentioned, Burton testified that he has had a problem with cocaine, which began around his junior or senior year of college, and that he sought help for this problem on a number of occasions. Burton testified he has been clean and sober now for a little over two years, and that he now does volunteer service work in a 12-step program to help others struggling with addictions.

---

[15] According to Burton's Complaint, he was found to be disabled by the Social Security Administration on March 15, 2002. Pl. Compl., at 2.

Additionally, Burton testified that he is currently taking three prescribed medications: Depakote, Celexa and Clonazepam.[16] He stated that he has been taking these three drugs for the past year and that the drugs were prescribed by the Veterans Affairs Medical Center and also by the Peninsula Behavioral Health Center. According to Burton, these medications cause him to feel tired and to experience nausea, tremors, loss of appetite, sleeping problems, and lack of desire for sex. Burton also testified that if he does not take his medicine that he can be difficult to be around, especially because the manic part of his illness makes him talk fast, have a rush of ideas, and have unrealistic expectations. Burton further stated that when he does not take his medicine there are times when it is difficult for him to get out of bed and that he tends to be very antisocial. Burton testified, that in his opinion, he will have to take medication until he dies, because he feels that he will have this condition for the rest of his life.[17]

Burton testified that members of his family also suffer from the same or similar illnesses. He stated that his mother and brother also suffer from Bipolar disorder, and his sister suffers from Schizophrenia. However, he also testified that his mother's illness only

---

[16] Burton stated that the Clonazepam is prescribed to help him sleep, but that the drug has the potential to be addictive and so he does not always use it. As to the other two medicines, Burton testified generally that they were prescribed medicines, the symptoms he experiences if does not take his medicines, and that they have negative side effects, but he did not testify to the exact reason each drug was prescribed and the symptoms each drug was intended to alleviate.

[17] Burton attempted to testify to what he asked his doctor regarding how long he will have to take his medication, but the testimony was objected to as hearsay by the Defendant, and the objection was sustained by the Court.

recently became apparent, and he did not testify to when his siblings were diagnosed or when their illness became apparent. Additionally, Burton's answer to Defendant's Interrogatories reveals that one of Burton's children has been diagnosed with Depression and Attention Deficit Disorder, and that the child takes Depakote. Def. Exh. E., Interrogatory No. 9.

### D. Testimony Regarding Living Situation and Expenses

Burton testified that he currently lives in downtown Newport News in an efficiency apartment that is part of a Section 8 housing program "for people who are formerly homeless and disabled." Tr. at 3. He stated that he has lived in the efficiency for the past five years and that he moved there from a half-way house.[18] Additionally, he testified that the efficiency consists of one room with a microwave and refrigerator (but no stove), and a bathroom. He also testified that the rent is subsidized, and that initially he only had to pay $25.00 per month, but that he now pays $128.00 per month because he receives Social Security disability.[19]

Burton owns a vehicle, which he testified that he purchased for $100.00 through the

---

[18] Burton also testified that he has lived at the Veteran Affairs Hospital on a couple of occasions. He testified that on one occasion he lived there for approximately six months and on another occasion for approximately nine months. Tr. at 12.

[19] However, it should be noted that Burton also testified that at the time he filed his Schedules in his bankruptcy proceeding, he was paying $342.00 a month. He testified that $342.00 is the amount that Newport News Regional Housing Authority was charging based on his gross income from Social Security. Further, he testified that the Housing Authority was charging him said amount because they were not taking into account his child support deduction, and that they have since adjusted his rent to $128.00 to take into account his child support deduction from his Social Security disability check.

Community Housing Partners. He further testified that the vehicle needs repairs, but that it is operable, and that he pays the insurance on it.[20] He also testified that he owns a computer that he built. He stated that he has access to the Internet through a dial-up connection, which is available at a lower rate to people with a disability.

Burton testified that his only current source of income is Social Security disability, which he has been receiving since 2002. The total amount of his Social Security disability check is approximately $800.00; however, he testified that he receives only $642.00 net from his disability check because part of his check is being garnished for child support.[21] He testified that he has five children, which range in age from 9 to 27 years old, and owes about $28,000.00 in child support arrears. Burton only has present support obligations for three children, since two of the children are over eighteen.[22] He testified that his obligation for

---

[20] Burton testified that there is no provision on his Schedule J for car insurance because at the time he filed for bankruptcy, the vehicle was not running as it was being repaired. However, presently he pays $147.00 per month for insurance.

[21] This Court is not entirely sure how to interpret the fact that Burton claims his check is for a little over $800.00, but that he receives $642.00 after a deduction of $274.00 is made for child support, because mathematically there appears to be some error. For Burton to be paying $274.00 in support and receiving $642.00, his gross disability check would have to equal at least $916.00. However, at another point in the trial, Burton testified that the $274.00 is not currently being deducted from his check; rather it would be deducted starting the following month. Further, he testified that this would decrease his net check to somewhere closer to $600.00 per month. It is possible this confusion regarding the timing of the $274.00 deduction explains the aforementioned mathematical discrepancy.

[22] Burton testified that his two eldest children are 19 and 27 years old. His present child support obligations are for the children aged 9, 13, and 14 years. He further testified that one child is from a previous relationship, separate from his marriage, and that while he has been paying support for the child, that he is not the father of the child. Additionally, he testified that the State of New York owes him money since he has been paying support for the child.

current support and arrears is approximately $274.00, which is automatically deducted from his Social Security disability check.[23] Burton stated that the three younger children also receive payments directly from Social Security, along with the $274.00 that is garnished monthly from his Social Security disability check.

Burton also testified about the additional expenses listed on his Schedule J. He testified that his current expenses are still approximately the same as the expenditures he listed on his Schedule J. Further, he testified that he currently spends approximately $70.00 per month on his telephone bill, $300.00 on food, $50.00 on clothing, and $40.00 on gasoline and other related transportation expenses. His Schedule J also reveals $20.00 per month that is budgeted for recreation, and $150.00 for child support. However, now that the child support payment is automatically deducted from his Social Security disability check, he should no longer have the $150.00 child support expense; rather he will have the $274.00 deduction for support taken directly out of his check. Burton also testified that he currently

---

However, he also testified that the State of New York claims that they do not owe him money, and that he cannot afford to take the issue to court. It is unclear to the Court if Burton was including this contested child as one of the five and/or one of the three minors, and therefore, whether this child is one of the three he currently helps support.

[23] Burton's testimony regarding his support obligations was very confusing and difficult for this Court to interpret. It is not entirely clear if the $274.00 includes arrears and current obligations; however, his testimony seemed to imply that. In Burton's answer to Defendant's Interrogatories, Burton stated that he pays $29.00 per month for the child born in 1991; $29.00 per month for the child born in 1992; and $219.00 per month for the child born in 1995. Def. Exh. E., Interrogatory No. 6. This calculates to a total of $277.00, which is certainly close to $274.00; however, Burton also testified that he received a court order stating his child support obligation would be increasing and that a larger deduction will be taken from his check the next pay period. Given the conflicting evidence and testimony, the Court is not entirely sure how to calculate the exact amount Burton pays in support.

pays $147.00 per month for car insurance, which is an expense that was not listed on his Schedules because the vehicle was inoperable at the time Burton filed for bankruptcy. This Court therefore calculates that Burton's average monthly expenses are between $750.00 to $1,030.00 per month, with the variation attributed to whether child support is treated as a deduction or expenditure.[24]

### III.
### ARGUMENTS

Burton argues that he has significant medical disorders, including Bipolar II and personality disorder, which prevent him "from engaging in substantial gainful activity." Pl. Compl., at 2. He argues he needs medication in order to function, yet the medication causes nausea, the shakes, and sleeping problems, which makes it difficult for him to maintain steady employment. Further, he argues that his resources are meager, with his sole income being his Social Security disability check. He points to his sporadic work history and his history of often making only $7.00 to $8.00 per hour,[25] as evidence of his inability to pay his student loans and as evidence that paying the loans constitutes undue hardship. Further,

---

[24] In arriving at this range, this Court allotted $128.00 for rent, $70.00 for telephone, $300.00 for food, $50.00 for clothing, $40.00 for transportation, $20.00 for recreation, $274.00 for the child support payment, and $147.00 for car insurance. Including the $274.00 as a expenditure makes Burton's expenses equal approximately $1,030.00, while leaving the $274.00 as a deduction results in his expenses being closer to $750.00. This Court recognizes that there was some confusion surrounding the testimony regarding rent and child support; however, this Court feels that the range of $750.00 to $1,030.00 is a fair approximation of Burton's current expenditures. Of course, it should be noted that while calculating child support as a deduction reduces Burton's expenses, it also reduces his net income.

[25] Burton's work history suggests that he generally makes between $7.00-$8.00 per hour; however, he did have one job that paid $14.00 per hour. *See supra*, fn. 11, at 7.

Burton argues that he will never earn enough to pay off his educational loans, and that even if he does manage to earn more money, all of that money will go to pay child support arrears.[26] Additionally, he argues that if his income were to increase, his child support obligation would also increase, and therefore, he still would be unable to pay his educational debts. He also argues that while he has not always made payments on his educational debt, he has done the best he could given his limited resources and that he has shown good faith.

ECMC argues that Burton is unable to meet his burden of proof under the *Brunner* test, which establishes a 3-prong test to determine whether an educational debt imposes "undue hardship." *Brunner v. New York Higher Educ. Servs Corp*, 831 F.2d 395, 395 (2d Cir. 1987). Specifically, ECMC argues that Burton cannot satisfy the second prong of the *Brunner* test. ECMC alleges that Burton is intelligent, articulate, and has had good experience in the past with certain jobs. Additionally, ECMC argues that Burton has been sober for two years, has a good medicinal regimen, and his prospects for the future seem encouraging. ECMC also argues Burton has not exhausted all possible resources to find employment. Further, ECMC argues that there is no evidence to support a finding that Burton cannot work, and that Burton has the burden of proving that he cannot secure employment.

In addition, ECMC argues that Burton has not satisfied the good faith prong of *Brunner*, because Burton has not made a loan payment in thirteen years, and that while

---

[26] Burton alleges that he owes $28,000.00 in child support arrears.

Burton alleges he made payments in the past, Burton did not produce documents to prove that fact when requested. Further, ECMC argues that if Burton was acting in good faith he would be willing to take advantage of one of the various loan payment programs ECMC proposed, such as the William D. Ford Repayment Program ("Ford Program"). Additionally, ECMC argues that because payments are based on present income under the Ford Program, Burton's payment would be zero; therefore, Burton should be willing and able to take advantage of the program.

## IV.
## CONCLUSIONS OF LAW

As this Court has recently discussed, student loans are generally non-dischargeable debts. *See Thompson v. New Mexico Student Loan Guarantee Corp. (In re Thompson)*, 329 B.R. 145 (Bankr. E.D. Va. 2005); *Gill v. Nelnet Loan Servs., Inc. (In re Gill)*, 326 B.R. 611 (Bankr. E.D. Va. 2005); *Murphy v. Sallie Mae (In re Murphy)*, 305 B.R. 780 (Bankr. E.D. Va. 2004). Congress has provided that government-guaranteed student loans are nondischargeable in bankruptcy unless the debtor can demonstrate that the repayment of such student loans would constitute an "undue hardship." 11 U.S.C. § 523(a)(8) (2005).[27] This exception from discharge of student loans "was enacted to prevent indebted college students or graduate students from filing for bankruptcy immediately upon graduation, thereby

---

[27] The citations and quotations in this Memorandum Opinion to Title 11 of the United States Code are to those sections in effect at the time Burton's Complaint was filed, not to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which took effect October 17, 2005.

absolving themselves of the obligation to repay their student loans." *Kielisch v. Educ. Credit Mgmt. Corp. (In re Kielisch)*, 258 F.3d 315, 320 (4th Cir. 2001) (quoting *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 436-37 (6th Cir. 1998)). Section 523(a)(8) of the Bankruptcy Code provides:

> A discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt
> (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C § 523(a)(8) (2005).

The term "undue hardship" is undefined in the Bankruptcy Code. The Fourth Circuit Court of Appeals has adopted the three-part test articulated in the decision of *Brunner v. New York State Higher Educ. Servs., Corp.*, 831 F.2d 395, 396 (2d Cir. 1987). *Frushour v. Educ. Credit Mgmt. Corp. (In re Frushour)*, ___F.3d___, No. 04-2553, 2005 WL 3557398, at *5 (4th Cir. December 30, 2005)) (adopting the *Brunner* test for determining dischargeability of student loans in cases filed under Chapter 7); *Ekenasi v. Educ. Res. Inst. (In re Ekenasi)*, 325 F.3d 541, 546 (4th Cir. 2003) (adopting the *Brunner* test for determining dischargeability of student loans in cases filed under Chapter 13). Thus, in order to discharge a government-guaranteed student loan, a debtor "must establish (1) that he cannot maintain a minimal standard of living for himself and his dependents, based on his current income and expenses, if he is required to repay the student loans; (2) that additional circumstances

indicate that his inability to do so is likely to exist for a significant portion of the repayment period of the student loans; and (3) that he has made good faith efforts to repay the loans." *In re Ekenasi*, 325 F.3d at 546 (quoting *Brunner*, 831 F.2d at 396).[28]

A determination of the dischargeability of a student loan must be brought by filing an adversary proceeding. *Banks v. Sallie Mae Serv'g Corp. (In re Banks)*, 299 F.3d 296, 300 (4th Cir. 2002) (citing Fed. R. Bankr. P. 7001(6)). Further, the debtor has the burden to prove all three prongs of the *Brunner* test by a preponderance of the evidence. *In re Frushour*, 2005 WL 3557398, at *5 (citing *O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn)*, 339 F.3d 559, 565 (7th Cir. 2003); *Brightful v. Pennsylvania Higher Educ. Assistance Agency (In re Brightful)*, 267 F.3d 324, 327 (3rd Cir. 2001)) ("The debtor has the burden of proving all three factors by a preponderance of the evidence.").

"Generally speaking, the legislative history of Section 523(a)(8) suggests a finding of undue hardship is an exception to the rule, and it must mean more than unpleasantness associated with repayment of a just debt." *Jones v. Nat'l Payment Ctr. (In re Jones)*, 242

---

[28] Prior to *In re Frushour* and *In re Ekenasi*, a number of courts within the Fourth Circuit had utilized the *Brunner* factors to analyze whether the repayment of a student loan constituted an undue hardship under Section 523(a)(8) of the Bankruptcy Code. *See Wilson v. Educ. Credit Mgmt. Corp. (In re Wilson)*, No. 01-30624, 2002 WL 32155401, at *3 (Bankr. E.D. Va. June 25, 2002); *see also Tennessee Student Assistance Corp. v. Mort (In re Mort)*, 272 B.R. 181, 183 (W.D. Va. 2002); *Vermont Student Assistance Corp. v. Coulson (In re Coulson)*, 253 B.R. 174, 177 (W.D.N.C. 2000); *Ammirati v. Nellie Mae, Inc. (In re Ammirati)*, 187 B.R. 902, 905 (D.S.C. 1995); *Virginia Educ. Assistance Auth. v. Dillon (In re Dillon)*, 189 B.R. 382, 384 (W.D. Va. 1995); *McCormack v. Educ. Credit Mgmt. Corp. (In re McCormack)*, No. 99-10637, 2000 WL 33710278, at *4 (Bankr. D.S.C. July 3, 2000); *Walcott v. USA Funds, Inc. (In re Walcott)*, 185 B.R. 721, 724 (Bankr. E.D.N.C. 1995).

B.R. 321, 325 (Bankr. E.D. Va. 1998), *aff'd in part and remanded on other grounds sub nom. Educ. Credit Mgmt. Corp. v. Jones*, No. 3:99CV258, 1999 WL 1211797 (E.D. Va. July 14, 1999). As the Fourth Circuit Court of Appeals has recently stated, "[i]nability to pay one's debts by itself cannot be sufficient; otherwise all bankruptcy litigants would have undue hardship." *In re Frushour*, 2005 WL 3557398, at *4.

"Each undue hardship discharge must rest on its own facts, but dischargeability of student loans should be based on a 'certainty of hopelessness.'" *In re Jones*, 242 B.R. at 325. (quoting *Lezer v. New York State Higher Educ. Servs. Corp. (In re Lezer)*, 21 B.R. 783, 789 (Bankr. N.D.N.Y. 1982)). In order to discharge a student loan, a debtor "must show that the unique or extraordinary circumstances which created the hardship render it unlikely that the debtor will ever be able to honor [his] obligations." *Id.* (citing *Love v. U.S. (In re Love)*, 33 B.R. 753, 754-55 (Bankr. E.D. Va. 1983)). Therefore, it is necessary to assess the evidence presented at trial to determine if Burton has proven that repayment of the student loans owed to ECMC will constitute an undue hardship.

A. Can Burton Maintain a Minimal Standard of Living?

The initial prong of the *Brunner* inquiry requires this Court to assess whether the debtor has proven he cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the student loans. *In re Ekenasi*, 325 F.3d at 546 (citing *Brunner*, 831 F.2d at 396). In making this assessment, "a court should examine the debtor's standard of living, with a view toward ascertaining